*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

KATELYN ZWIKER, Individually and on Behalf of All Others Similarly Situated,

Plaintiff-Appellant,

v

LAKE SUPERIOR STATE UNIVERSITY and LAKE SUPERIOR STATE UNIVERSITY BOARD OF TRUSTEES,

Defendants-Appellees.

FOR PUBLICATION
February 10, 2022

No. 355128
Court of Claims
LC No. 20-000070-MK

KEVIN HORRIGAN,

Plaintiff-Appellant,

v

EASTERN MICHIGAN UNIVERSITY and EASTERN MICHIGAN UNIVERSITY BOARD OF REGENTS,

Defendants-Appellees.

No. 355377
Court of Claims
LC No. 20-000075-MK

JAEL DALKE,

Plaintiff-Appellant,

v

CENTRAL MICHIGAN UNIVERSITY and CENTRAL MICHIGAN UNIVERSITY BOARD OF TRUSTEES,

Defendants-Appellees.

No. 357275
Court of Claims
LC No. 20-000068-MK

Before: SWARTZLE, P.J., and K. F. KELLY and REDFORD, JJ.

-1-

SWARTZLE, P.J. (*concurring in part and dissenting in part*).

In these three consolidated appeals, the student plaintiffs allege that they bargained for in-person instruction when they registered for courses and paid tuition for the winter/spring 2020 semester. The university defendants counter that they promised nothing of the kind. This is not a dispute about good intentions; rather, this is a dispute about what was promised and what was received. And what was received lacked much, if any, pedagogical value, according to the student plaintiffs.

Although my colleagues have provided a well-reasoned, thoughtful opinion affirming summary disposition on all of the student plaintiffs' claims, I cannot join the opinion in full. With respect to the student plaintiffs' claims apart from those for breach of contract involving tuition, I join my colleagues in affirming summary disposition. On the remaining tuition-based claims, however, I part company for the following reasons:

First, the parties' tuition agreements center on the exchange of educational services for tuition payments. Described broadly, the student plaintiffs had to pay tuition to the university defendants, and, in exchange, the university defendants had to offer educational services to the student plaintiffs. Thus, the question of what constitutes educational services is key here. On this question, neither the offering of registration nor the granting of credits carries the weight that the university defendants suggest; these are more accurately characterized as incidences of educational services rather than the services themselves.

To see this, consider registration. Registration in-and-of itself is not an educational benefit to a student—no one has ever gotten smarter just by registering for a course. Registration is, rather, the means by which the student selects the educational services that best fit the student's needs. For a university, registration serves to aid with allocating resources and sorting students and instructors. Although a student's obligation to pay tuition might be triggered by that student's registering for a course, the university does not fulfill its contractual obligation to the student solely by offering the registration—the university must then follow-up by actually offering the promised course to that student. Any agreement that purportedly required a student to pay tuition in exchange for the mere opportunity to register for a course without the subsequent offering of that course would fail for lack of consideration. See *Gen Motors Corp v Dep't of Treasury, Revenue Div*, 466 Mich 231, 238-239; 644 NW2d 734 (2002); *Prentis Family Foundation v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 58; 698 NW2d 900 (2005). Thus, the university defendants did not fulfill their end of the bargain merely by providing the opportunity for the student plaintiffs to register for winter/spring 2020 courses.

Similarly, the university defendants did not fulfill their end of the bargain merely by awarding credits to the student plaintiffs. Although credits are an important component of educational services, the credits alone are not sufficient to satisfy the provision of such services. I am not yet cynical enough to conclude that students go to university solely to gather credits for a diploma; in any event, there is nothing in the record to suggest that this was the case with any of the student plaintiffs here. Thus, to hold up their end of a valid bargain, the university defendants had to offer the bargained-for educational services to the student plaintiffs separate and apart from the offering of registration or the awarding of credits.

Second, unlike with the room-and-board claims, the university defendants have not pointed to any force-majeure provisions relevant to the tuition claims. Nor have the university defendants fully developed impossibility as a defense on appeal,[1] though even if they had, the argument would raise the matter of which party should properly bear the "risk (i.e., the financial burden)" of the pandemic-related campus closures. *Rosado v Barry Univ Inc*, 499 F Supp 3d 1152, 1158 (SD Fla, 2020). Discovery in these three cases has been quite limited thus far, however, so I do not want to stress these points beyond what the current record permits.

This brings me to my third and final point. It is useful to conceptualize the provision of educational services along a spectrum. At one end, there is the traditional, in-person university course, taught for a full semester by a qualified instructor, with the student earning a grade and receiving a credit at the conclusion of the course. At the other end, there is nothing—the university takes the student's tuition and cancels the course. There is little question that the former would meet the requirements of educational services, and there is likewise little question that the latter would not. Analogous to the traditional, in-person course, I would also place in the category of "educational services" an online/virtual course that was designed, prepared, and marketed to students as an online option from the outset of the semester. Analogous to the outright cancellation of the course, I would place in the category of "no educational services" an audio recording of a textbook, with no further instruction, to be followed by an AI-mediated exam, surely an extreme form of "asynchronous education."

Where along this spectrum do the courses that the student plaintiffs took in the winter/spring 2020 semester fall? The current record appears to show that from the beginning of the semester until mid-March, the courses fell within the category of actual educational services. Yet, when governments across the state imposed pandemic-related public and private restrictions, including lockdowns, the university defendants immediately pivoted from traditional in-person instruction to what the student plaintiffs have labeled "emergency remote teaching." Although the university defendants have resisted the use of this label, I find it useful to differentiate between the transitioned courses at issue in these appeals from those courses offered by the university defendants that were marketed to students as online/virtual courses from the very start of the semester.

Returning to our spectrum outlined above, if the university defendants had simply canceled courses in mid-March for the remainder of the winter/spring 2020 semester, then I would have little trouble concluding that the university defendants breached the parties' tuition agreements. The student plaintiffs paid tuition for a full semester of educational services, and had they been provided with half a semester of educational services, this would have constituted only partial performance by the university defendants, resulting in a breach of the tuition agreements. See *Blazer Foods, Inc v Rest Properties, Inc*, 259 Mich App 241, 252 n 7; 673 NW2d 805 (2003). Did the pivot to emergency remote teaching result in a partial breach analogous to the outright canceling of courses, or was the emergency remote teaching sufficient under the tuition

---

[1]Only Central Michigan University mentions impossibility in its brief on appeal, and it devotes one paragraph and footnote to the issue within a broader argument. See *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015).

agreements? Did the student plaintiffs properly understand their agreements with the university defendants to include in-person instruction, not emergency remote teaching?

On this nascent record, I cannot say. Frankly, the answer might depend on the particular course at issue. For example, an in-person course that had met in a large lecture hall with one instructor and 200 students might very well have immediately transitioned to an online environment with little or no loss of benefit to the students. But, what about a physical-education course? How could a student receive any benefit from a weight-training course transitioned immediately to a virtual environment if that student did not have access to the necessary training equipment? Or, similarly, what about a dance student or music major? Few apartment buildings would sanction the robust practicing of an aerial or a marimba in a studio apartment. Or what about a small acting or public-speaking course? Even with respect to more traditional lecture-centered courses, there is evidence in the record suggesting that the rapid transition to emergency remote teaching significantly reduced, if not eliminated altogether, any pedagogical value of the services. Did the student plaintiffs properly understand that their courses would be taught in-person, as described by course catalogs when they registered, or was the emergency remote instruction so clearly deficient as to be, in practical terms, no instruction at all? As a federal district court remarked in a case involving similar breach-of-contract claims, "This is kind of like purchasing a Cadillac at full price and receiving an Oldsmobile. Although both are fine vehicles, surely it is no consolation to the Cadillac buyer that the 'Olds' can also go from Point A to Point B." *Rosado*, 499 F Supp 3d at 1158.

The student plaintiffs present their claims as breaches of contract, and not as negligence-based claims of educational malpractice. As our Supreme Court explained in *Page v Klein Tools, Inc*, our courts do not recognize a claim for educational malpractice for a host of reasons, including a lack of institutional expertise in evaluating educational choices, uncertainties involving causation, and avoidance of overseeing the day-to-day operation of educational institutions. 461 Mich 703, 712-716; 610 NW2d 900 (2000). I am mindful of the line between contract and tort here, and it is unclear to me whether the student plaintiffs can ultimately prove their breach-of-contract claims without crossing that line. But at this early stage of the lawsuits, the student plaintiffs should be given the opportunity to make their case. See, e.g., *Metzner v Quinnipiac Univ*, 528 F Supp 3d 15, 28-31 (D Conn, 2021) (distinguishing similar contractual claims from the educational-malpractice doctrine and permitting the contractual claims to move forward).

In the end, there is a growing body of evidence, including evidence in this record, that students of all ages suffered significant educational setbacks during the winter/spring 2020 semester, and possibly beyond. It adds insult to injury for a university student to have to pay full price for emergency remote teaching when that student allegedly bargained for much different educational services. As I review the record, there remains a genuine issue of material fact on plaintiffs' tuition claims. The parties should have the opportunity for full discovery, followed by a trial if a question of fact remains.

For these reasons, I respectfully concur in part with, and dissent in part from, the majority's opinion.


/s/ Brock A. Swartzle